I call the case of United States of America v. Corey Grant, Mr. Lussberg. The court, Lawrence S. Lussberg and Gibbons, PC, on behalf of the appellant, Corey Grant, with the court's permission, I would like to reserve two minutes for rebuttal, Your Honor. Granted. Thank you. This case presents the court with a constitutional conundrum. After Roper, Graham, Miller, and Montgomery, it's clear that juvenile defendants, based upon their particular physiological and psychological traits, cannot, consistent with the Eighth Amendment to the Constitution, be subjected to first a death penalty, and now, except in the rarest of circumstances, to sentences of life without parole. With regard to that latter proscription, a growing number of states have, not surprisingly since the proscription is against life without parole, reacted by providing for sentences that address this constitutional problem by allowing juvenile defendants to seek parole after a certain period of time, ranging from 15 years in West Virginia up to 40 years in Texas and Colorado. In New Jersey, where I live, it's 30 years. That is, states have reacted to Graham and Miller by addressing the prohibition on life without parole by requiring that juveniles be considered for parole after some specific number of years of their sentences. The conundrum in this case results because that solution is not available here. Since our federal system has, since 1984, abolished parole. Of course, one way that the court could address that problem in cases like Mr. Grant's is to invalidate the Sentencing Reform Act's abolition of parole as applied to juvenile defendants. Or it could, in line with the correspondence that the court sent to us on Friday, decide that some other provision of law, perhaps the First Step Act, if it were the equivalent of parole, stand in and create the opportunity for parole. Or it could, as the panel did previously in this case, and as we hold, albeit in proposing somewhat different solution, argue that actual, hold that actual release is actually required or presumptively required after some particular period of time. But respectfully, in deciding this case, what the court really should do, consistent with its appropriate judicial function, is to interpret the applicable Supreme Court jurisprudence and provide guidance to the lower courts as to what a constitutional sentence may be for a juvenile who is capable of reform. In particular, it is this court's constitutional responsibility, its judicial duty, to interpret the rule pronounced so clearly in Graham that juvenile offenders be released in time to have a chance for fulfillment outside of prison walls, for reconciliation for society, for hope while in prison. In other words, the process by which a juvenile is to be afforded a second look is only one of the questions before the court. The court must ultimately decide how long is too long under the Eighth Amendment for a juvenile who is not incorrigible. In doing so, the court will truly take the next step in the process that the Supreme Court has initiated for evaluating what is and what is not an appropriate sentence for a juvenile. We know it cannot be death. We know it cannot be life without parole, except in the rarest of cases. And now the question is, how long can it be in order to satisfy the test of Graham that juveniles be required to be released in time to have a meaningful chance for fulfillment outside of prison walls? The panel courageously sought to address this question by deriving one possible solution. Indeed, one like ours that is based upon a presumption of release for a non-incorrigible juvenile defendant at a certain period of time, although the panel answered the question how long is too long with the national age of retirement? We propose a different answer, one that we respectfully submit is more faithful to both the analysis required by the Eighth Amendment, and particularly the categorical proportionality of the Eighth Amendment, and by the science that at least since Roper has been helped to guide this type of analysis. The purpose, as always, is to require only a sentence that is consistent with, quote, the evolving standards of decency that mark the progress of a maturing society. Respectfully, a presumptive cap of 30 years fulfills that constitutional mandate. That's the conclusion of my opening remarks, I'm happy to answer any questions. Mr. Lesberg, we know from Montgomery that for juvenile homicide offenders who are non-incorrigible but sentenced to life without parole, I think the language of the opinion referred to their hope for some years of life outside of prison walls must be restored. A few moments ago, you referred to language about chance for fulfillment being so clear. I'm not so certain of that, of its clarity. In fact, I'm not even sure I know what that language means. Help me with what hope for some years of life outside prison walls means. Rather than my ask, this is a follow-up, if you could then go on to explain if we were not to adopt a presumptive 30 years as you suggested, what guidance otherwise ought we to give sentencing judges who are being called upon to make these determinations, as they make all the time in sentencing defendants? Thank you, Chief Judge. Let me be clear and modest. I didn't mean to make it seem like it was clear what a meaningful life outside of prison walls means, what fulfillment means, what hope means, what reconciliation with society means. This court has the difficult role it does in this case, as in many, because it's required to take those broad types of phrases that the Supreme Court provides and give them meaning. Well, but it seems to me that the more difficult jobs could be for that sentencing judge, who has that very human being in front of her or him, with all the unique qualities, characteristics, history, and so forth, that a sentencing judge is quintessentially qualified to take into account. So, if we were not to agree that 30 years is either appropriate or a rule we ought to adopt, why not simply trust the district judge or the sentencing judge to do what she or he always does, and that is engage in individualized sentencing, take into account making a full set of editorial projections of life expectancy, and all sorts of other factors. Why isn't that enough? It's not enough, Your Honor, because the federal system, unlike the state systems that have adopted parole, that have parole processes, does not afford what we know is necessary in juvenile cases, which is a second look. That is to say, what the line of Supreme Court cases stands for, including perhaps most significantly Miller and Montgomery made it retroactive, is the idea that at the time of sentencing, it is an incredibly difficult thing for judges to do, to know what the future holds for a juvenile defendant, who is at that point in the process of growing and maturing. Difficult as it may be, the Supreme Court has certainly allowed explicitly for situations where rare, as they suggest, as they state, but where someone may be incorrigible and therefore be an appropriate candidate. Absolutely, and also has made clear that those situations where the judgment that someone is incorrigible can be made are very rare indeed. That's the language from Miller. It's going to be the rare case where a court, where a sentencing court can look at a juvenile defendant and say, we know that this person is forever incapable of reform. That is going to be the truly exceptional case. So the question that we have is, for sure, a judge could, considering a whole realm of factors, from the 3558-3A factors to the Miller factors regarding youth, to the question of considering what would, in fact, deprive a defendant of fulfillment and reconciliation and hope, could come up with a sentence. And that's fine, but the question that this case now raises is the question of what would be too much under those circumstances. And courts have wrestled with the state, Supreme Courts mainly, have wrestled with the question of whether there's at least an upper limit on that. So at least three state Supreme Courts, Connecticut, California, and Maryland, have said that a sentence of 50 years or more would be too long to fulfill the grand mandate. So why not leave this to legislative bodies, as some have, as you have acknowledged, already taken up and adopted statutes addressing this very question? I wish that Congress would address this. That would certainly be a very different situation here if Congress had taken the Supreme Court's mandate and converted it into appropriate legislation. That would be a great thing if it happened. It hasn't happened. And so that presents this court with the problem that it now has, which is it has to decide Have they done it in the First Step Act? You asked the question, or made the statement, the court must ultimately decide how long is too long. If Congress has said in the First Step Act that now the geriatric release program, which used to be, as you pointed out in footnote in your briefing, solely within the discretion of the Bureau of Prisons, now that's not any longer the case. It is accessible to inmates based on their own motion, and the court will have to look at it and have to decide it, and the Congress has said that happens at 65? Why isn't that enough? Why doesn't that answer the question? It doesn't answer the question because when one looks, Judge Jordan, at Section 3582 and understands what its purpose is, that is a compassionate release provision. It is a provision that has always been used and has always been interpreted to be used in circumstances where someone is dying, and if you look at the guidelines Well, that may have been the case pre-First Step Act, but now they've said it's no longer what it was before, and in fact the Bureau of Prisons has laid out the sort of factors to be considered, and they include personal history, length of sentence, amount of time served, inmates' age at the time of the offense, inmates' release plans, the sort of things that are traditionally considered in a parole setting. Why isn't this akin to Virginia v. LeBlanc, where the Supreme Court said, you know what? That's in bounds. I understand it was under the Edpolins, but that's in bounds. Why aren't we in that same spot now? We could be in that same spot, and let me just say, if the First Step Act were interpreted to provide for a meaningful opportunity for release in the way that Graham and Miller require, and that would include an opportunity to show maturity and rehabilitation, as Justice Ginsburg says in her concurrence in LeBlanc. That is, if it were a genuine opportunity for parole, then I completely agree that that would solve the problem. The question, of course, that raises all kinds of questions that we simply don't know the one month after the advent of the First Step Act. But why don't we have that with the terms of the statute itself? You reference compassion and those particular examples, but it's not entitled Compassionate Release. It may be a name that's been assigned to it. It's extraordinary and compelling reasons. And why shouldn't we interpret this line of cases from the Supreme Court to provide, in a constitutionally compelling reason, for release where there is not solely rehabilitation, which would not be permissible, but where there's a combination of juvenile offense status at the time of the offense and demonstrated rehabilitation? And would that, in your view, if that were available on a motion from the defendant, would that satisfy the Eighth Amendment? It could. The short answer to your question is, depending on how it's interpreted, the answer to that may very well be yes. And to me, that would be a gigantic step forward. The statute, 3582, is written against a backdrop. You're right. It doesn't say Compassionate Release. It doesn't talk about geriatric release. It's not what it... But that is the history of that provision. And the legislative history of it does not reveal, as far as I could tell, that what Congress was trying to do there was to address the problems raised by Graham and Miller. I searched the legislative history, and did not see, I could be wrong, any allusion to the fact that what Congress was attempting to do there was to fix that problem. Isn't it a step further? As I look at it, when it says elderly inmates with medical conditions, that's the precondition, right? And then, what Judge Jordan just read to you a moment ago is preceded by the following. Additionally, for inmates in this category, now the category that it's referring to is the elderly inmates, in which it talks about, it has to be 65 and older, you have to suffer from chronic or medical, or serious medical conditions, experiencing deteriorating medical or physical health. So all of those preconditions have to be considered, and some of them have to be met. Before you can get to, additionally for inmates in this category, the BOP should consider the following factors when evaluating the risk that an elderly inmate may re-offend. So that's your reference to compassionate release, which obviously, technically, is not in the statute. And then it says the age at which the inmate committed the current offense. Having said all that, my question to you is, when you're sentencing a 15-year-old, what role could 3582 play in your decision making? Alluding to what Chief Judge Smith mentioned a moment ago, we give discretion and we have a tremendous responsibility of sentencing. So I've given you a lot of information, but the real focus of the question is, what role can 3582 play in the sentencing of a 15-year-old? Thank you, Judge. That was actually where I was getting to in answering Judge Crass's question. And here's what I mean by that. When a judge in a state court sentences a defendant to a period of time before parole, what is contemplated is that there will be a certain type of parole proceeding that will occur at a certain period of time that is one that is constitutionally appropriate. That would not be the case here. That is to say, when a judge were to sentence a defendant today, they would be aware that there could be, if those various conditions were met, the opportunity for release at a particular time. Let me be clear. If this court wants to boldly interpret 3582 to be the equivalent of parole, to actually provide the same measure of assessment that parole does, there would be a lot that this court would have to read into that. Well, when you say boldly, with respect to my colleague, maybe you can help me. I'm reading what I think he's reading from, which is 1B1.13, where it's the commentary to the sentencing guideline, which is based on 3582C. It defines extraordinary and compelling circumstances as including any of the circumstances set forth below. It's not a conjunctive test. You don't have to have a medical condition. You don't have to have debilitating deterioration. You don't have to have extraordinary family circumstances. You have to have one of those things or, quote, other reasons. And those other reasons refer to what the Bureau of Prisons has historically looked at. And those reasons are ones I just read to you from the Bureau of Prisons manual. So since it appears to be a disjunctive test, why doesn't the other reasons and the reasons that I've just recited to you do exactly what Virginia was doing in the LeBlanc case, which the Supreme Court said is good enough? Respectfully, I don't think the Supreme Court said it's good enough in LeBlanc. They said it was good enough under AEDPA. The Supreme Court said, maybe, maybe not. But because maybe not is a possibility, then AEDPA was certainly not the place to decide the case. That's my reading of LeBlanc. Let me follow up on that. It was on the clearly established law standard, but I wonder whether you had the same problem here. Because when I read the sentencing transcript, sentencing counsel argued that Miller forbids mandatory sentences, forbids consideration of the guidelines, holds juveniles less culpable. But where does sentencing counsel preserve the claim that the Eighth Amendment forbids a discretionary term of year sentence that's de facto life imprisonment? I couldn't find that. Certainly the question, certainly amicus raised the question about, because I was amicus at that point, raised the question of what was, of whether the life without parole prescription of Miller included de facto life without parole. This court, the panel, and this court certainly addressed the question of whether de facto life without parole was included. Where at sentencing was this preserved? It was discussed substantially at sentencing. The whole, what the sentencing, what the resentencing was about, Judge Bibas, was the question of given the Eighth Amendment questions that have been presented by Miller, that case was there because this court had allowed for a second petition and said every sentencing has to occur under Miller. And the whole question was, what is an appropriate sentence, one that would satisfy the Eighth Amendment in the wake of the Miller decision? And that was what we were doing there. At a high level of generality. At a very, now I will concede, Your Honor, that there's no question that what was not raised as the sort of solution to the problem, either the one that the panel came up with or the one that we're proposing today, the particular type of solution to the problem, nor was the 3582 type of solution proposed at that time. What was argued was that there needed to be a particular sentence that was one that would satisfy the Eighth Amendment. It was broad strokes, I agree. And if plain error includes plain error with regard to the remedy that one seeks, which I don't think is an appropriate definition of plain error, then that would be a problem. So I agree with you there. But I do think that the constitutionality, the constitutional limits for sentencing of juveniles was squarely before the court and was discussed at length during the sentencing. Can we go back to the... I'm going to ask one question in three parts, because time's running out, I won't get another question. Yeah. First of all, the Catholic 30 years, the problem I have with that, is that if we assume that the younger the kid is, the less culpable the kid is. And the older the kid is, conversely, the more culpable the kid is. Having the same cap for a kid who's 12 and commits a heinous crime, but is not incorrigible, that you do for a kid who's 18 years minus a day, gets it backwards. Because then the younger kid is going to serve longer than the... They serve the same amount of time, but the culpability is not the same, number one. What happened to the personality principle? What role does that play? And is it just dropped out of the equation in these kinds of cases? The Supreme Court, he says, as Breyer said, it's the driving principle behind 3553A. Why shouldn't there be some requirement for the sentencing judge to meaningfully determine what is the least severe sentence that I can give this person to meet the objectives, which I assume are just going to be deterrence and punishment? And then the last one, up front, how does it help, even if we look at compassionate release as some kind of parole mechanism, how does that help a judge in imposing the up front sentence? Because it seems to me that would almost encourage a longer sentence for someone who's less culpable. Because if the judge knows, well, I don't have to make that determination, there's going to be a parole or a look back, a model penal code kind of look back provision, it's easier for the judge to ramp up the amount of time because, in a sense, the judge is covered. So a bunch of questions in there. I know, but I won't get a chance to ask another one. Thank you, Judge McKee. The answer under the formulation that really both the panel's formulation and our formulation with regard to your first question, which is the notion that a younger defendant should be treated differently than an older defendant, would survive. Because after all, both the panel's conclusion and ours is one that relies on a presumption. And presumably, then, if for a defendant who was 12 or 13, that would be the type of thing that would be considered when determining whether the presumption should be overridden in a way that makes the sentence shorter rather than longer. This, and if I just could finish my answer, Judge Smith, this question, though, of juveniles serving longer sentences has always been at the root of Miller and Graham. The problem, in a way, that what the court was confronting in those cases was that for life without parole sentences, juveniles were actually getting longer sentences because they were being sentenced earlier than adults. So we always have to keep that irony in mind. And the way to incorporate that irony into the analysis is by doing two things. By applying the 3553A factors, including the parsimony principle, and as well to include within it, under these circumstances, the Miller factors of youth, which have to be considered both in determining whether a juvenile is incorrigible and what the sentence on that juvenile ought to be. All right. We'll have you back on rebuttal. And Judge Krauss can get her question in at that time. Keller? Oh, I'm sorry. I neglected to note that we do have amicus here. I was aware of that, but forgot. He is aged. Thank you. Good morning. May it please the court. Marcia Levick for Amici Juvenile Law Center. And thank you for giving me the opportunity to argue this morning. I'm going to pick up where this sort of conversation has been going. And I know that my co-counsel, Mr. Hillsburg, started with characterizing this as a conundrum. And I think that's a good word to use.      It's a conundrum that we can't argue. It's a conundrum that we can't argue. And unquestionably, in this space of juvenile sentencing, in the wake of Roper and Miller and Graham. Why is it a conundrum? Yes. I mean, it seems to me that the government conceded before the district court that a sentence that exceeds the life expectancy of a non-encourageable juvenile homicide defendant violates the Eighth Amendment. They conceded that in footnote three of their petition for rehearing. All right. So that is the constitutional starting point. It's a principle that every sentencing judge must acknowledge right out of the box. Why isn't enough going forward to trust the sentencing judges now, with that as a backdrop, to sentence every non-encourageable juvenile accordingly? This is why. Because the Supreme Court cases, Roper, Graham, and Miller, and then Montgomery, recognizing that Miller established a substantive rule of constitutional law, have all forbidden mandatory sentencing and have developed categorical solutions to the sentences that they were confronted with, whether it was the death penalty, life without parole in Graham, or mandatory life without parole. And the reason why the court made those categorical determinations, and the same reason why it recognition that the risk of error in those cases is too great. That the risk of disproportionality is what drove the court to categorically forbid a particular type of sentence. What is being suggested here by wanting to defer back to the sentencing judge is to assume that the sentencing judge can yet again figure out how to overcome the aspects and the those sentencing judges from issuing a sentence that would, in fact, be proportionate and not disproportionate. Those were all mandatory. They were mandatory sentencing regimes. The question that's being put to you is, without those mandatory regimes in place, what is it that disables sentencing judges from exercising discretion here as they do in every other kind of case? I mean, this is a particular set of circumstances that courts are required to think about now after Graham and Miller. But why don't we just say, okay, we trust judges. That's why we hire them. And now they've got a sentence with Graham and Miller in mind. Well, because respectfully, both the death penalty and life without parole in the Graham scenario involving juveniles who were convicted of non-homicide crimes were not mandatory sentences. And in both of those cases, the court really, the U.S. Supreme Court, believed that the what would be a proportionate sentence for that juvenile, that they needed to create a set of criteria that would allow the judge to do that. Do you think that the Supreme Court was meaning to say sentencing judges can't be trusted and so there has to be a hard and fast rule set down for all juvenile offenders? Is that where you're going? I think that what the court has said is that because there's a particular and unique challenge here in the federal system with the absence of parole, so what the Supreme Court said in both Miller and in Graham was the court said we're going to strike these sentences and then the court laid out a set of criteria that the sentencing court should consider and that is what I think is being presented here. We have the Miller factors that the court should consider. Why doesn't that solve the problem? The reason why it doesn't solve the problem here is because there is no parole. What the court envisioned in coming up with a solution in Graham and in Miller, particularly in Miller and identifying the Miller factors, was that there would be this meaningful opportunity for parole where you have both a sort of first bite and second bite where the sentencing judge Might they not have anticipated that you'll have a meaningful opportunity to have a sentencing judge look at what we've said here in Miller and Graham and take those things into account and sentence accordingly, even if there's no parole? I think it's very difficult to do it in the absence of parole because those sentences are really built on a structure that presumes there is an opportunity for the individual to demonstrate growth and maturity and rehabilitation. The real question that all of us have is why are we sticking to what seems to be an arbitrary 30-year limit that's been suggested, which I presume you adhere to, and why not set up a regime where district court judges do what they've been doing for years, which is exercise their discretion with certain either definitions, factors, or a test in mind? Obviously, we have one on the table. That's the real question we'd like you to grapple with for us. And I'm just going to assume I can answer your question. Yes, please. You do have time to answer the question. The reason why I think the presumptive solution is the appropriate one, and of course with the panel decision there was a presumption about natural retirement age as being the sort of outer limit. We all agree that de facto life is something that is covered by Miller. We all agree that something that exceeds life expectancy is something that is covered by Miller. The question before this court and the question before a sentencing judge would be, but when is the sentence too long? We know under Miller and Graham and Montgomery that a sentence is too long if it prohibits the not incorrigible juvenile from having a meaningful opportunity for relief, for having an opportunity for fulfillment outside prison walls, for having an opportunity for hope, for having an opportunity to achieve reconciliation with society. We know all of those things. And I think that in the absence of that second look that is naturally built into the state system, providing for a date at which we can presume, and that date of presumption of 30 years wasn't pulled out of a hat. It is a date that is quite consistent with now decades-long research that talks about the difference between adolescence-limited and life-course-persistent juvenile offending. We know that in a field of 100 individuals who commit crimes as juveniles that roughly 5 or 6 percent of them will reoffend. There are 38 juvenile lifers in the federal system. If all 38 juvenile lifers were sitting in this courtroom right now, the numbers of those individuals who would be likely to reoffend past the age of 30 or 40 is actually 2, 5 or 6 percent of that number. So that is a number that I want to be clear and to support. It's a number that is rooted in research that justifies and supports the sentencing goals, certainly in terms of protection of the public, and also meets the requirements of Miller that individuals who are not incorrigible, and 95 percent of them are not going to be incorrigible, have a meaningful opportunity for release to rejoin society to be reintegrated into their communities. Thank you. May it please the Court, I'm Bruce Keller for the United States. Thank you for this additional opportunity today. Here's what Miller guarantees. No sentence can be imposed on a corrigible juvenile if it imposes a term of life without any chance to later demonstrate maturity, it imposes a term of de facto life also without that chance, or it ignores youth as a mitigating factor. Cory Grant's constitutional challenge to his discretionary 65-year sentence fails on each of these measures. It's not a term of life. And it was imposed only after a resentencing hearing where his youth was the principal reason for reducing his prior life sentence. That sentence is constitutional, and we ask that it be affirmed. Now, 65 years is significant. It keeps Mr. Grant in prison until his 70s. But the Eighth Amendment test for disproportionate juvenile sentences is not any lengthy sentence, but one so long that it raises the same concerns as an execution that brings life to its end. That's Graham's entire rationale. Only an actual sentence of death literally requires an execution. But life without parole irrevocably mandates the same result. And when it's imposed on a corrigible juvenile, it takes an entire lifetime from teenage years on to get there, and that makes it, Graham says, especially harsh. But here's what separates us. Mr. Lussberg reasons that if the guarantee of death behind bars for a corrigible juvenile is disproportionate, the constitutional proportionate remedy must be the opposite of that, the guarantee of release and release early enough to effectuate hope, fulfillment, and reconciliation out of prison. Can't be. That misreads the language about hope that was in Graham. Graham, Miller, and Montgomery make clear the Eighth Amendment does not guarantee release even for corrigible juveniles because release is always conditional. It's never guaranteed. You have to prove, in the case of a juvenile, that you've been transformed from immature to mature and rehabilitated. And Montgomery identified two possible means to make that showing, parole or resentencing. Mr. Grant got the latter. Based on the constitutional role youth must play, that resulted in his non-life term of 65 years, and that's not a de facto life sentence. The parties agree. Mr. Grant currently is scheduled for release by 72 but has a life expectancy years beyond that. There's no constitutional issue left. Any review of his sentence by this court must be for substantive reasonableness, a standard Mr. Lussberg does not even attempt to meet on this record. And that is why we are pushing today, we're here, that he pushes for a new constitutional standard, and that's what it is. It's a new standard that holds release at 72, comes too late. It's based on the incorrect proposition that the Eighth Amendment also guarantees quality years outside of prison. That's an unworkable standard. It abandons the objective disproportionality standard the Supreme Court has used, the guarantee of death in prison, and replaces it with a subjective assessment of the quality of life at various ages. It's also wrong. It transforms Graham's meaningful opportunities, and they exist pre-release, that is the opportunity to try to get released, into meaningful opportunities post-release. Hope denied is what makes life without parole disproportionate. It is not the constitutional guarantee. Here's how we know it's wrong for sure. Had Montgomery's substantive Eighth Amendment guarantee, had the court identified the guarantee as having anything to do with a cap, presumptive or otherwise, or the quality of post-release life in 170s, it would have applied to Henry Montgomery himself. When he was before the court in 2016, he already was 70 years old, 53 years into his life sentence. But all he was guaranteed was parole eligibility, not a cap, not a presumptive cap. It turns out he still hasn't qualified. He's still in prison at age 72, the age by which, assuming good time credits, Mr. Grant calculates his release. That provides him with more certainty than mere parole eligibility, which is the guarantee in Montgomery. And that's, of course, before the other possible Graham opportunity raised by LeBlanc, compassionate release, as now administered without any medical precondition, you have the opportunity to show that you have transformed from an immature juvenile, and that's why you committed your crimes, to something else. That allows, as Montgomery said, the proof of the central guarantee of Miller that juveniles can change over time. Thank you. I'll proceed any time left for your questions. Mr. Keller, I assume that I'm correct that the government conceded, as I indicated a few minutes ago in the PFR, that a sentence that exceeds the life expectancy of a non-encourageable juvenile is indeed a violation of the Eighth Amendment. You have conceded that point. Yes. And while we've not previously been called upon to hold that, I assume that you also would agree that the Seventh Circuit's opinion is a sound basis, and its reference that the logic of Miller applies would be a sound basis for such a holding. Yes. Let me take it. I can go a half step further. Let me help you. Judge Linares had the discretion to impose a sentence less severe than life without parole, and he obviously thought he was doing exactly that. If you wish to give guidance, I suggest it may be that when you're dealing with a juvenile and you have these Eighth Amendment issues lurking in the sentence that you have the discretion to impose, impose something short of life expectancy because, as we know, life expectancy is the 50-50 point, but why get close? Well, this case reaches us in a rather not novel but unusual procedural circumstance because it's a resentencing. Correct. At which there was information and evidence available to the district court well down the road that is farther in life for Mr. Grant than what would otherwise be available at an initial sentencing by a sentencing judge. So your position is that some, and I was going to ask this and you've anticipated me, that is what kind of guidance short of a fixed period of time, some per se rule, and you're suggesting that one thing we could indicate to district judges is that they be looking to sentence for some years short of what life expectancy tables would show. Is that what you're suggesting? Yes, and it's not that novel. It's come up in the Seventh Circuit cases to which you alluded, which we cited in our brief. They come up in a different context, but the proposition is the same. There are some life sentences that may not be imposed by sentencing courts, perhaps in jury findings. In those cases, the Seventh Circuit, which has written a light on that, has said, look, if you're at the outer limits, if you're at life expectancy where it's that 50-50 proposition, we know the odds of living beyond life expectancy will decrease over time. Why even get close if all the other factors, Judge Jordan, 3553A factors considered, if they counsel a very long sentence, bear in mind in the juvenile case, there's an outer limit before you start running up against the Eighth Amendment. You can steer clear of that if you balance everything and conclude that a sentence short of life expectancy, which is just a statistical point, also will satisfy the sentencing goals in 3553A. What if that point becomes our understanding of life expectancy? And the sentencing guidelines provide life expectancy based on a general population calculation at 470 months or 39 years. Do we really want to task district courts with evidentiary hearings that are specific to the medical histories and family histories, along with the concerns about disparities based on race or ethnicity or gender that come with actuarial tables in trying to determine a particular life expectancy for a given defendant? Or should there be some generic view, like the sentencing guidelines, for example? Your Honor, I've identified that the issue is fraught. And I'm not saying it's fraught. I'm not suggesting that it makes a lot of sense to impose all of those conditions on formulating a sentence. I was simply pointing out that we all know that life expectancy is used in business all the time. Why doesn't it make sense? Yes, life expectancy cases or life expectancy tables are used on an evidentiary basis in wrongful death and survival actions all the time, for example. Beyond that, in the more relevant context, sentencing in capital cases involve not so many mini-trials. We have evidence put on for days often. So what is so fraught with problems here in asking a sentencing judge to conduct a meaningful, evidence-bound, testimonial, if necessary, proceeding at which, at the end, the judge comes up with what she or he considers to be a fair and compassionate sentence? Well, I was really responding to Judge Krause's point about ethnicity and some of the limits of emphatically emphasizing tables that, by definition, subdivide cohort groups. Aren't there ways evidentially with experts that those matters can be addressed as well? It was the suggestion I thought I heard in the question of somehow a discriminatory bias in some of the tables that I was really responding to. Of course, in those situations, life expectancy tables are used on a regular basis. I'm also sensitive to the fact that sentencing courts have a lot to do already and to consider already when they impose a sentence, and I'm not suggesting that you need to issue any particular rule other than to warn them about the Eighth Amendment consequences. It really is, after all, it's the burden on the defendant to make the showing as part of their sentencing case. We pay attention to the Sentencing Commission, though, right? And the Sentencing Commission does say, I mean, you've said this isn't a life sentence, but the Sentencing Commission says that a 470-month or longer sentence is a de facto life without parole. That's the way they presume. That's the way they've identified it. That's the way they move forward since this fellow got approximately a quarter century longer than that. I mean, why wouldn't we be in a position to look at what the Sentencing Commission has said and try to do some anchoring or thinking around that as an appropriate marker? Understood. The reason is that the Sentencing Commission does that in a very, very specific context. It has a duty to make some reports, statistical reports on the population under its control, and what it did was it measured life expectancy of the people that are already in prison. It's not a very good measure when you translate it to other circumstances. It may be a much better measure because the generalized actuarial tables don't factor into consideration a lot of the kinds of life-determinant variables that I assume are factored into that population. If N equals the prison population, that's a very different actuarial inquiry than if N equals the general white male population of Manhattan. I take your point, Judge McKee. But, in fact, and the record doesn't really show this because it didn't come up before. That goes to your point, Judge Bibas. It was never raised before, but the data on that's all over the map. The data on life expectancy of prisoners is all over the map, but one thing is really crisp on this record. When you're talking about sentencing a juvenile, as you heard from Ms. Levick, you're not talking about the type of population that's currently really reflected in the Bureau of Prisons' data because those are adults. They're adults now, and there are very few juveniles that were ever sentenced. And so the data that the Sentencing Commission is using based on that report is really inexact, and that is the best answer I can give you as to why, among all the other things a sentencing judge should consider, life expectancy is a useful guide because it provides a warning sign. Get to this point, you're possibly dealing with a de facto life sentence, and I come back to my main point, which is Judge Linares, at the urging of Mr. Grant and his amicus counsel, avoided that problem by not letting the guidelines range of life drive his sentence, but instead, although he took it into account, factoring in Miller Montgomery, Graham, and the weighing of the 3553 actors, and that really was the only Eighth Amendment argument below. It really was. If you look at the sentencing memos, they don't talk about de facto life or a cap or any of these other issues. But the entire discussion is about term of years, right? I mean, I forget other counsel's name at the moment. Mr. Glazer. What? Glazer, Mr. Glazer. Glazer, right, Glazer. Mr. Glazer, throughout the transcript, is talking about a term of years. You know, he's trying to induce, might be a strong word, but he's attempting to induce Judge Linares to think about this as 32 years would suffice. There was some discussion of 40 years. He says 40 years is tantamount to life without parole. That's a quote, so he did say it. So the issue is clearly before the court. I don't understand. Yeah, I'll back up on that if I may. It seems like you argued that there was a forfeiture of the argument about a 30-year presumptive sentence, not necessarily that there are—you never argued that Grant forfeited his Eighth Amendment challenge to the sentence as a de facto life without parole. So, Your Honors, I have to disagree with you. I sat in on the sentencing. I read the transcript. We all did. We saw it on the record. When you read that and you read the briefs, the request for a term of years is not linked to the Eighth Amendment. Yes— We're just talking about preservation, right? When you say that argument was never made. I'm reading it. A40 in the appendix. As a practical matter, I mean from our standpoint, Judge, a 40 is tantamount to life without parole. Close quote. That's a statement made to the judge by Mr. Glazer in the hearing. So an assertion that that term of years constitutes life without parole was in front of the judge, right? Your Honor, I'm sorry. I have to give you my same answer. When that statement was made, it was not linked to an Eighth Amendment argument. The statement was made, but under this Court's jurisprudence, and we cited the cases for you, I don't think that's preservation of the Eighth Amendment argument. But let's not worry about whether it was plain error because let's get back to the main event. We're all here today. Let's deal with whether there was any error below. And so I come back to my point about the 65 years being short of life expectancy is not a de facto life sentence and does not raise a constitutional issue. We can disagree as to whether it's too long, but as I started in my opening, not every long sentence is going to be unconstitutional for a corrigible juvenile. It must guarantee death and a sentence short of de facto life for whatever use the life expectancy tables provide to you is not such a sentence. How do we know that, that it's short of life? There's no finding of what life expectancy is. You are correct again, Judge Greenway. I'm going by the Supreme Court's definition of what Graham prohibits. It prohibits denying a meaningful opportunity to leave prison before death. I'm totally with you, right? But as I understood the record, there was a disagreement between you and Mr. Lustberg as to what life expectancy was, whether you calculated from 15 or you calculated from 42. And I thought, and you'll correct me if I'm wrong, there's no finding. So when you say he got a sentence less than life expectancy, how do we know that? I really don't think there is a disagreement because Mr. Lustberg's initial brief defined a de facto life sentence, one that goes beyond life expectancy at pages 23 and 24 of his opening brief. So we know that we've got to be past life expectancy for it to be a de facto sentence. He initially misread the life expectancy tables, and we pointed that out. Many people do make that same mistake. They measure from birth instead of from the appropriate age. And the appropriate age is always the age at sentencing. And when you take the age at sentencing, or in this case resentencing, which went back down a year and a half, two years ago, Mr. Grant was 43, and he had another 40-plus years, 39-point-something, if you read the table across, that takes you to 77. Now, the misreading of the tables took Mr. Grant initially to 72, and of course that's how he's calculating his release. But I think we've moved beyond that because we do know that – He doesn't say that's a misreading. He argues that there are ex post facto and due process concerns that would be raised by using the current age as opposed to the age of birth. Well, yes, but that's not – we've explained why those arguments are not correct. No other court has adopted them. But the initial problem with life expectancy was based on a miscalculation from birth versus from current age. And there are always – life expectancy tables have no purpose except to tell at the person's current age what is the expectancy of future years. But we knew from the transcript that Judge Linares, as he should have, looked when he sentenced Grant to putting himself potentially in the position of Judge Ackerman, and that is sentencing a teenager. I'm sorry. I was looking for something I thought could help answer your question, and of course I missed the back end of the question. Could you help me out, please? No. Okay. Fair enough. I deserve it. No, my point was just Judge Linares, when he imposed sentence, right, imposed the sentence as though Grant were a 16-year-old essentially standing in the shoes of Judge Ackerman. Oh, I don't really think that's a fair reading, Your Honor, and here's why. Well, I mean, he said it. That's what he said. Well, he did say that I read the entire trial transcript, and he said I focused on particular – with a particular interest on what Mr. Grant's role was at the trial. Well, he said I'm sentencing him as – in the same position that Judge Ackerman did, and he talked about the fact that he was 16. But the context in which he said that was very different, Your Honor. We'll all respect it. He said that in the context of reviewing the drug sentences, and we know that he had to do that because what he also did was take into account what Mr. Grant's record was in prison. You couldn't do that if you were just sentencing him as if it was an original sentencing. Then the post-prison incarceration record, which was equivocal at best for Mr. Grant – I mean, he has lots of infractions, and they're not all phone infractions. There are some serious ones there. He took all of that into account, and if he took all of that into account, he clearly wasn't – I know what he said, but the context shows that he wasn't stepping back in time to the original sentencing. You're focusing on life expectancy and release before taking the actuarial number, whatever that is, age of X. That as long as the person gets out before age of X, that is not tantamount to life sentence. But what are we to do with all the Supreme Court's language about fulfillment outside prison walls and those chances of reconciliation for society? If he dies or she dies one day after release, by your submission, I get the feeling of saying, well, that's sufficient because it wasn't a life sentence. But yet that person was not given any realistic chance for fulfillment outside of prison walls. And answer that in context with somebody coming out of prison after, say, 30 years, whatever the number is, how employable is the person? Even absent the prison record, they wouldn't be employable. Things like a cell phone or a smart device they may never have seen before, their idea of advanced technology as a push-button phone. Someone like that, from that mindset and that universal experience, how do we wrestle with, how does a sentencing judge wrestle with fulfillment outside the prison walls if we're focusing on allowing the person to die after he steps foot outside of the prison, no matter how long that period may be? Does that make sense where I'm trying to get to? I think I do, and here's my answer, because it's a really important point.  He listens. You got him. That's the problem. I think my job today is to try to help out. Let me see if I can. The language about hope, reconciliation, and fulfillment is absolutely positively what the court is talking about when it is describing all that life without parole denies, not what the Eighth Amendment guarantees. Graham literally says that. At that point in the opinion, 560 U.S. at page 79, it is discussing the deprivation resulting from execution in prison, and then it says, but through a different dynamic, the deprivation of life without parole is equivalent. It distinguishes that, however, Your Honor, from the Eighth Amendment guarantee, because then it goes on to say, and this is key, and Montgomery cinches it, the Eighth Amendment guarantees a meaningful opportunity to obtain release based on demonstrating teenagers' bad acts do not show their true character. Those are two very different things, and if Graham left any doubt about it, the door was shut with Montgomery, and that's why I open by emphasizing the point that Mr. Montgomery himself was 70 years old when he was before the court in 2016. If the Eighth Amendment substantive guarantee, and Montgomery is all about explaining what the substantive guarantee as opposed to the procedural guarantee of the Eighth Amendment is, if the substantive guarantee was a meaningful life outside of prison, it couldn't have come out the way that it did for Mr. Montgomery. That is why the court emphasized at least two possible fixes, parole eligibility, which Mr. Montgomery did get, and a resentencing which Mr. Grant got, and that may take me, if ... Let me focus on something else for a moment. You've been asked, you provided us with 28J on 3582. I want to make sure you have your papers before I continue. I'm with you now, Judge. Okay, great. So you gave us a 28J on 3582, so I want to focus on that for a moment, right? So I asked your adversary at this point, I'd like your input on it as well. So I'm a district court judge. I'm sentencing a 16-year-old, so exact same age. I'm sentencing a 16-year-old. How does, how could, how would 3882 play into my thinking in sentencing? And you know why I'm asking the question, but here's the issue that I have that I'm trying to explore. In order for 3582 to come into play for a 16-year-old, that's 50 years away. The likelihood of anybody who's sitting on the bench being on the bench in 50 years, all due respect, hope everybody lives a long life, is unlikely, right? So how is that going to play? How should it play a role in my decision-making in sentencing that 16-year-old? As a practical matter, my answer is not so much. Let me explain why. That, however, is different from whether or not it does satisfy what Graham, Miller, and Montgomery require as a constitutional remedy. Well, if they don't, the reason that I'm going to interrupt you and beg your pardon is if it's a factor in my decision-making, it either is or it isn't a factor in my decision-making. It's certainly in the mix of things that any sentencing judge is going to consider when they are imposing a very long sentence. That is why in response to the questions that started with your question, Justice, I said you're short of life expectancy is really a very good practice that you can provide guidance to on district courts. Your point, Your Honor, is what else can we say about 3582 and how much of a role does it play? And I said not so much for these reasons. I do have to disagree with one thing that I think you said earlier. There is no medical precondition. It is absolutely clear when you look at the program statement that BOP implements pursuant to the guidelines, 1B113, it says in addition to the medical conditions, which is how almost everyone thinks about compassionate releases, I get that, right? That's where you start. But there's that provision, and it says all you have to do is be 65 or older and serve 10 years or 75% of your sentence. It's just a geriatric release-based requirement, and it does trigger, Your Honor, some of the things that were raised by the Supreme Court's review in LeBlanc. But it is down the road. However, if your sentence, notwithstanding your having sentenced based on the guidance of this court, perhaps years short of life expectancy, if it's really long and it takes a juvenile to age 65 such that they have served 75% of their sentence by that point, and that is the case with Mr. Corey Grant in 2038, by the way, assuming even without calculating good time credit, just do the math. In 2038, he's both 65 and has served 75% of his 65-year sentence. Then, Judge Krauss, to your point, if you factor that in along with the other requirements, which is that it's not a parole provision, but it is a provision that allows for extraordinary and compelling circumstances like the fact that, oh, my gosh, back decades ago, we sentenced a juvenile to a very long sentence, even if not life. And what do we do with respect to the Eighth Amendment analysis that we have to look at now? Aren't you conflating two distinct, and as I read it, and correct me if I'm wrong, independent provisions that are made for a reduction in sentence? And one, so we've got 3582C1A1, which is for extraordinary and compelling reasons. And on that, there's no age limit. There's no percentage of the sentence served. It's simply extraordinary and compelling reasons, which is not further defined. And then we've got 3582C1A2, which is the provision that is geriatric release, and that is for 70 years old. Now, again, maybe I'm misunderstanding. It's a little confusing, Your Honor. But the geriatric provision says it applies only to defendants who are sentenced under Section 3559C, which is the three-strike mandatory life imprisonment, which, as I understand the record, Grant wouldn't even be applicable for. So we're not talking about anything that has a 70-year floor to it, right? We're talking about what the First Step Act does for Subsection 1, which is a standalone opportunity for a sentence reduction at any point. Yes. Because you made it 20 years, right, and renewed it 30. Those two things are not mutually exclusive. What I was referring to is that in the program statement that BOP issued under 3582 and the Sentencing Commission's policy statement implementing 3582, there is a standalone provision that has nothing to do with the provision that you were quoting about age 70. It's just a standalone other elderly inmates provision. Inmates age 65 or older who have served the greater of 10 years or 75 percent of the term of imprisonment to which the inmate was sentenced is something that the Bureau of Prisons, in an appropriate case, may, if you meet all the other thresholds, consider to be an extraordinary and compelling circumstance. It is a pure geriatric release provision subsumed within extraordinary and compelling circumstances, but not everyone is going to be able to satisfy it. And I have to say, I don't want to mislead anybody here, although it is another fix, because what's the GRAM requirement, as LeBlanc emphasizes, and then the Fourth Circuit in the case that turned into LeBlanc said, you need to have an opportunity to demonstrate maturity and rehabilitation. And if this is a straight age threshold, then maybe you'll be able to qualify at age 65, given how long you've served. But if you have a record that's equivocal, I'm not so sure you've shown what GRAM requires, which is that you have transformed yourself from the immature youth who committed horrible crimes, which obviously resulted in a long sentence, into someone who is worthy of geriatric release. But qualifying and eligibility are two different things. I really appreciate your indulgence. Thank you very much. Thank you. I'd like to make two points. There have been fundamentally two proposals that have been floated today as to potential fixes, other than the one that we propose, for the Miller problem. One is that trial courts gaze into their crystal balls, gather a lot of information, do a principled examination of at least three things. Don't you think that's a little pejorative, Mr. Osterling? No. Gaze into their crystal balls. I'm in my 35th year of judging, 18 of which was as a trial judge and sentencing judge. I've watched all the time Congress and state legislatures impose mandatory minimum sentences and impose guideline regimes because they didn't trust judges. Isn't there inherent in your position a certain sense of that, a certain whiff of that, that you can't trust judges to do the correct thing, if not the right thing? Your Honor, I don't mean to be pejorative when I talk about crystal balls, nor is this an effort to – I'm opposed to mandatory minimums and I agree with – So am I. And I agree with that sentiment. But here's what there has to be. There has to be the type of principled sentencing that you, Your Honor, described, one in which the actuarial tables are well used. And I should note that in this case they were misapplied. At the time of Mr. Grant's sentencing, his life expectancy was 67.2 years. That's in our reply brief. That is, this was a sentence of de facto life without parole at the time. Now it's later. But whatever. At the time – you're right. At the time of sentencing there could be a meaningful, appropriate consideration of actuarial tables, of the 3553A factors, including the parsimony principle, of the Miller factors. And what I would add to that is there would have to be a meaningful consideration of the fact that at the conclusion of that sentence there would have to be a meaningful opportunity for fulfillment outside of prison bars, reconciliation with society, and hope. The second proposal that's been discussed is the idea that there would be a revisiting of the sentence through 3552, 3582, or otherwise. Our position with regard to that, and I want it to be clear, is that that would be fine so long as it is the type of fulsome, appropriate, parole-type determination that would include fully the opportunity for consideration of whether there's been maturity and rehabilitation. Judge Cross, I'm going to keep my word if you'd like to get that question in that you didn't have an opportunity to ask earlier. If you could just speak to, because your briefing also suggests that there is availability of the geriatric release provision, but by its terms that wouldn't be applicable to Mr. Grant, right? He wasn't sentenced under 3559. He was not. That's correct. That's correct. Thank you very much. Thank you very much, Mr. Lustberg. Thank you to all three of the oral advocates for their very helpful arguments. Thank you for the briefing in this profoundly important case. We'll take it under advisement. We'll also ask for the preparation of the transcript, and we'll ask the clerk to adjourn the proceedings. Thank you.